UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. **2:19 cr 197** |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | JUDGE ⎩Judge Watson |
| | ) | |
| | ) | |
| TROY BALGO | ) | 18 U.S.C. § 1347 |
| | ) | 18 U.S.C. § 1349 |
| Defendant | ) | 21 U.S.C. § 841 |
| | ) | 21 U.S.C. § 846 |
| | ) | FORFEITURE |
| | ) | ALLEGATIONS |
| | ) | |
| | ) | **<u>INDICTMENT</u>** |
| | ) | |

**The GRAND JURY charges:**

At times material to this Indictment:

<u>DEFENDANT</u>

1.    Defendant TROY BALGO (BALGO) resided at 66766 Graham Road, Saint Clairsville, Belmont County, Ohio 43950.

2.    BALGO was a Doctor of Osteopathic Medicine in the State of Ohio, licensed under State Medical Board of Ohio Medical License # 34.006700.

3.    BALGO owned and operated two medical facilities. The first was Belmont Urgent Care (URGENT CARE), located at 187 West Main Street, Saint Clairsville, Ohio 43950. BALGO incorporated URGENT CARE on July 2, 1998, and also owned the building in which it is located. The second was Valley Medical

Management of Pain (VALLEY), located at 51342 National Road, Suite J, Saint Clairsville, Ohio 43950. BALGO incorporated VALLEY on June 15, 2012.

4.    BALGO prescribed controlled substances, including highly addictive opioids, as part of his practice at each facility. BALGO was registered with federal and state authorities to prescribe Schedule II-V controlled substances at each facility.

5.    BALGO was the only individual reportedly prescribing controlled substances at either facility. He employed office and medical staff at each facility, but was the only licensed Doctor of Osteopathic Medicine or Medical Doctor practicing at either of these facilities.

6.    As the owner and operator of both URGENT CARE and VALLEY, BALGO entered into agreements with the Medicare Program (Medicare) and the Ohio Medicaid Program (Medicaid), amongst other insurance plans, to provide reimbursement for services provided at URGENT CARE and VALLEY.

7.    BALGO entered into an agreement to provide Medicare services and items rendered at URGENT CARE on or around June 15, 1998. BALGO entered into an agreement to provide Medicare services at VALLEY on or around June 21, 2012.

8.    BALGO entered into an agreement to provide Medicaid services and items rendered at URGENT CARE on or around September 16, 1998. BALGO entered into a corresponding agreement to provide Medicaid services at VALLEY on

2

or around October 4, 2012.

GENERAL ALLEGATIONS AND TERMINOLOGY

Victim Health Insurance Programs

9.     The information provided in this section describes the Victim Health Insurance Programs (See "Attachment A" which is incorporated into this Indictment and serves as the Fed. R. Crim. P. 12.4 Disclosure Statement).

Medicare

10.     Medicare was a federal health insurance program providing benefits to persons who are 65 or older or are eligible due to certain disabilities. The individuals who received Medicare benefits are referred to as "beneficiaries."

11.     Medicare was a "health care benefit program" as defined by 18 United States Code, Section 24(b).

12.     Medicare was administered through the Centers for Medicare and Medicaid Services (CMS). CMS was a subsidiary agency of the United States Department of Health and Human Services.

13.     Medicare Part B, which CMS describes as medical insurance, covered certain doctors' services, outpatient care, medical supplies, and preventative services.

14.     Medicare Part D, described as prescription drug coverage, subsidized the costs of prescription drugs for Medicare beneficiaries. It was enacted in 2003 and went into effect on January 1, 2016. Medicare beneficiaries could obtain Part D

3

benefits in two different ways: they could join a Prescription Drug Plan, which covers only prescription drugs, or they could join a Medicare Advantage Plan that covers both prescription drugs and medical services.

15.    Medicare beneficiaries enrolled in a Medicare Part D plan typically filled their prescriptions at a pharmacy utilizing their Part D plan coverage to pay for the prescription. The pharmacy then submitted the prescription claim for reimbursement to the Medicare beneficiary's Part D plan.

16.    Medicare insurers were compensated for the provision of medical services, including prescription drugs, which were medically necessary and in compliance with state and federal laws, rules, and regulations. Health care service providers were required to verify that requirement as part of the process to become a Medicare provider, and acknowledge the criminal penalties for individuals who knowingly and willfully execute a scheme or artifice to defraud any health care benefit program, or obtain, by means of false or fraudulent pretenses, representations, or promises, any money from a health care benefit program.

17.    Further, health care practitioners were required to acknowledge that the unique Medicare identification number issued to a solo practitioner could be used only by that practitioner, or a supplier to whom the practitioner has reassigned benefits under current Medicare regulations, when billing for services rendered by the practitioner.

Medicaid

18.    Medicaid, established by Congress in 1965, provided medical insurance coverage for individuals whose incomes were too low to meet the costs of necessary medical services.

19.    Medicaid was a health care benefit program as defined by 18 United States Code, Section 24(b).

20.    Medicaid was administered through state governments, as overseen by CMS and funded in part by state and federal funds. Approximately 60% of Ohio's Medicaid program was funded through CMS. Ohio's Medicaid program was administered through the Ohio Department of Medicaid (ODM). ODM received, reviewed, and paid Medicaid claims submitted by health care providers.

21.    Upon approval by ODM, the Ohio Office of Budget and Management issued payment via check or electronic fund transfer (EFT) from its office at 30 East Broad Street, Columbus, Ohio 43215.

22.    Pursuant to the rules and regulations of the Ohio Medicaid Program, Medicaid paid only for services that were actually performed by qualified individuals, and were medically necessary and appropriate for the patient. Health care practitioners were required to acknowledge that requirement as part of the process to become a Medicaid provider.

Coding

23.     The American Medical Association assigned and published numeric codes known as Current Procedural Terminology (CPT) and HCFA Common Procedure Coding System (HCPCS) codes. The codes were a systemic listing, or universal language, used to describe the procedures and services performed by health care providers. The procedures and services represented by these codes were health care benefits, items, and services within the meaning of Title 18, United States Code, Section 24(b). They included codes for office visits, diagnostic testing and evaluation, and other services. Drug products were identified and reported to the Food and Drug Administration using a unique three segment number called the National Drug Code (NDC), which was a universal product identifier for human drugs.

24.     Health care providers used CPT, HCPCS, and NDC codes to describe the services and drugs that they claimed had been provided, and health care benefit programs used the codes to evaluate those claims (and information supporting those descriptions) in deciding whether to issue or deny payment.

25.     Each health care benefit program established a fee reimbursement for each drug or service described by a CPT, HCPCS, and/or NDC code.

26.     Specific CPT codes were assigned for evaluation and management (E/M) services provided to patients in a physician's office. Among these E/M services were office visits billed under CPT codes "99211," "99212," "99213," "99214," and

6

"99215." Health care benefit programs reimbursed health care providers at increasing rates based upon the heightened complexity indicated by each respective office visit code.

27. The CPT codes for 99211, 99213, and 99214 provided, in relevant part:

a. 99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

b. 99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians usually spend 15 minutes face-to-face with the patient and/or family.

c. 99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

28. CPT codes 99212 through 99215 were required to be performed by a physician or qualified health care professional and billed under the name of the physician or qualified health care professional who provided the services.

CONTROLLED SUBSTANCES ACT

29.     The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 841(a) *et.seq.* and Title 21, Code of Federal Regulations, Section 1306.04, governed the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA and the Code of Federal Regulations (CFR) contained definitions relevant to this Indictment, some of which are set forth below.

30.     The term "controlled substance" meant a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV and V, as designated by Title 21, United States Code, Section 802(c)(6), and the CFR.

31.     The designation "Schedule II" meant the drug or other substance had a high potential for abuse; the drug had a currently accepted medical use with severe restrictions; and abuse of the drug or other substance may lead to severe psychological or physical dependence.

32.     The designation "Schedule IV" meant the drug or other substance has a low potential for abuse relative to substances that are listed as Schedule III. However, concurrent use of some Schedule II (such as opioids) and Schedule IV controlled substances (such as benzodiazepines) greatly increased a patient's risk of overdose and death.

33.     The term "dispense" meant to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

8

34.     The term "distribute" meant to deliver (other than by administering or dispensing) a controlled substance.

35.     The term "practitioner" meant a medical doctor, physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which she or he practiced, to dispense a controlled substance in the course of profit.

36.     The Drug Enforcement Administration (DEA) issued registration numbers to qualifying doctors, who thereby become authorized to dispense Schedule II, III, IV, and V controlled substances.  To issue a prescription for a controlled substance, a doctor must have maintained a DEA registration number for each location in which the doctor dispenses medicine, and for each state where the doctor is prescribing controlled substances.

37.     The term "dosage" was the amount, frequency, and number of doses of medication authorized by a practitioner who has been issued a DEA registration number.

38.     The term "prescription" meant an order for medication which was dispensed to or for an ultimate user, but did not include an order for medication which was dispensed for immediate administration to the ultimate user.

39.     Title 21, Code of Federal Regulations, Section 1306.04 provided that "[a]ll prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug

9

name, strength, dosage form, quantity prescribed, directions for use, and the name, address and registration number of the practitioner."

40.   Under the CSA and CFR, a prescription for a controlled substance was unlawful unless issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.

41.   Under those requirements, a doctor must have performed at least basic physical and/or diagnostic examination of a patient prior to prescribing controlled substances.

42.   Fentanyl was a Schedule II opioid controlled substance.

43.   Morphine was a Schedule II opioid controlled substance.

44.   Oxycodone was a Schedule II opioid controlled substance.

45.   Oxymorphone was a Schedule II opioid controlled substance.

46.   Hydromorphone was a Schedule II opioid controlled substance.

47.   Alprazolam was a Schedule IV benzodiazepine controlled substance, commonly known by the brand name Xanax®.

## COUNT ONE

### HEALTH CARE FRAUD

48.   Paragraphs 1 through 47 are incorporated by reference as though fully set forth herein.

49.   On or about the dates set forth below, in the Southern District of Ohio and elsewhere, the defendant TROY BALGO, aided and abetted by others known

10

and unknown to the Grand Jury, did knowingly and willfully execute a scheme to defraud a health care benefit program as defined in 18 U.S.C. § 24(b), namely Medicare and Medicaid, in connection with the delivery or payment for health care benefits, items or services by billing or causing false and fraudulent claims to be submitted for 1) medical services that were either not provided or were provided by individuals who were not qualified to provide such services; 2) up-coded office visits not provided by BALGO; and 3) prescriptions for controlled substances that were illegally dispensed and distributed below the usual course of medical practice and without a legitimate medical purpose.

50.     Specifically, on or about the dates set forth below and additional dates known and unknown to the Grand Jury ranging from at least 2015 through 2019, the defendant TROY BALGO, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully execute a scheme to fraudulently bill Medicare and Medicaid for office visits, diagnostic testing, and prescriptions of controlled substances on dates that BALGO was not physically present in the office – or the State of Ohio – to perform those health care services.

51.     The defendant TROY BALGO did authorize billing for those services using diagnosis and CPT codes indicating that he performed them, when he was physically unable to do so. Many of the same patients who were reportedly treated by BALGO on those dates were also prescribed dangerous, highly addictive Schedule II controlled substances.

11

52.     Instances of dates when BALGO travelled while URGENT CARE and/or VALLEY billed for services not rendered include:

a.     On June 21, 2016, BALGO flew to Las Vegas, Nevada, where he stayed at the Mandalay Bay Resort and Casino (Mandalay Bay) through June 26, 2016. BALGO made travel arrangements and conducted multiple financial transactions during this trip to Las Vegas, including cash transactions for which currency transaction reports (CTRs) were filed by Las Vegas casinos.[1] BALGO was physically unable to perform any of the services billed under his name during that time period.

b.     BALGO travelled to Keflavik, Iceland from September 21, 2018 to September 30, 2018, as corroborated by travel and financial arrangements identified through BALGO's finances. BALGO was unable to perform any of the services billed during this period.

c.     BALGO returned to the Mandalay Bay from November 24, 2018 through November 27, 2018. BALGO conducted multiple transactions at Mandalay Bay during this trip, including cash transactions for which CTRs were filed by Las Vegas casinos. Again, BALGO was unable to perform any of the services billed while he was at the Mandalay Bay during this period.

---

[1] CTRs are required to be filed by any financial institution – including casinos – for cash transactions in which $10,000 or more is transferred. Financial institutions are required as part of the filing process to confirm and report the identity of the individual conducting the reported transaction. Title 31, United States Code, Section 5313; Title 31, Code of Federal Regulations, Sections 1010.310 and 1010.312.

53.    URGENT CARE and VALLEY billed for a combined $58,610.41 in health care claims to Medicare and Medicaid on those dates alone. 350 controlled substance prescriptions were written in BALGO's name during the same dates.

54.    Examples of patient treatment billed during the aforementioned dates that BALGO was travelling include:

| Patient | Approximate Date of Billed Services | Description of Billed Services | Controlled Substances Prescribed | Insurance Billed |
|---------|-------------------------------------|-------------------------------|----------------------------------|------------------|
| J.B. | 6/24/2016 | **99213**: Office visit requiring expanded examination; **13** separate individually-billed drug tests | N/A | Medicaid |
| B.D. | 9/27/2018 | **99214**: Office visit requiring detailed examination; **81025**: Pregnancy test | Fentanyl | Medicare |
| C.B. | 9/28/2018 | **99214**: Office visit requiring detailed examination; **22** separate individually-billed drug tests | Oxycodone w/ Acetaminophen | Medicaid |
| T.C. | 11/26/2018 | **99214**: Office visit requiring detailed examination; **80307**: Presumptive drug test; **G0483**: Definitive drug test | Hydrocodone w/ Acetaminophen | Medicare |

55. BALGO maintained supporting medical staff in both URGENT CARE and VALLEY who were capable of performing the services billed to both Medicare and Medicaid during these trips.

56. However, the manner in which the services were billed was unlawful even if supporting nurse practitioners completed the services. None of the supporting medical staff were qualified physicians capable of performing services justifying CPT billings for 99213 or 99214 visits.

57. BALGO was educated about proper billing of office visits by a representative of a Medicare Administrative Contractor on May 23, 2016. The representative informed BALGO that he was not allowed to bill health care benefit programs for CPT codes 99212 through 99214 for office visits in which he did not see the patient. BALGO acknowledged during this conversation that those billed visits are generally random drug tests, and that he does not see the patients on those dates. BALGO was educated that at most, his office could bill a 99211 if a non-physician conducted an office visit. BALGO indicated he would research a more appropriate billing code for these circumstances.

58. However, BALGO continued to bill elevated office visit CPT codes during the entirety of the aforementioned period from 2014 to 2019, while travelling and unavailable to perform any of the billed services.

**In violation of 18 U.S.C. §§ 1347 and 18 U.S.C. § 2.**

14

## COUNT TWO

### CONSPIRACY TO COMMIT HEALTH CARE FRAUD

59.    Paragraphs 1 through 58 of the Indictment are incorporated by reference as though fully set forth herein.

60.    On or about the dates set forth in Count 1, in the Southern District of Ohio, and elsewhere, the defendant TROY BALGO knowingly and intentionally combined, conspired, confederated, and agreed together with other persons known and unknown to the Grand Jury, to commit Health Care Fraud in the manners and means outlined above.

### Purpose of the Conspiracy

61.    It was the purpose of the conspiracy that BALGO and co-conspirators unlawfully enriched themselves by submitting or causing the submission of false and fraudulent claims to health care benefit programs for 1) medical services that were either not provided or were provided by individuals who were not qualified to provide such services; 2) up-coded office visits not provided by BALGO; and 3) prescriptions for controlled substances that were illegally dispensed and distributed.

62.    It was the further purpose of the conspiracy that BALGO and co-conspirators diverted proceeds of the fraud for the personal use and benefit of the defendant in the form of compensation and other means of remuneration.

15

## Manner and Means for the Conspiracy

63.    It was part of the conspiracy that BALGO, and/or co-conspirators aided and abetted by BALGO, submitted or caused the submission of false and fraudulent claims to health care benefit programs for services that were either not provided to URGENT CARE and VALLEY patients, or were provided by unqualified individuals in an up-coded billing manner.

64.    It was further part of the conspiracy that BALGO and co-conspirators caused the submission of claims to health care benefit programs for controlled substances that were dispensed and distributed by pharmacies as a result of prescriptions that were illegally issued to URGENT CARE and VALLEY patients.

## Overt Acts

65.    In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the co-conspirators committed, among others, the following overt acts in the Southern District of Ohio, and elsewhere.

66.    BALGO maintained an electronic system to maintain health records, submit prescriptions to pharmacies to be dispensed, and bill health insurance providers such as Medicare and Medicaid.

67.    BALGO explicitly refused to grant employees of URGENT CARE or VALLEY their own log-in information to this system due to the cost. Rather, BALGO required that employees enter health notes, prescriptions, and billing using BALGO's login and under BALGO's name.

68.     Co-conspirators, both known and unknown to the Grand Jury, submitted billings for health care services and prescriptions for controlled substances using BALGO's electronic log-in information and name on multiple occasions.

69.     These submissions and prescriptions made while BALGO was not present in his clinics, or even the State of Ohio, by co-conspirators known and unknown to the Grand Jury, caused the fraudulent reimbursement by Medicare and Medicaid for medical services BALGO never performed.

**In violation of 18 U.S.C. §§ 1349 and 18 U.S.C. § 2.**

## COUNTS THREE THROUGH EIGHT

UNLAWFUL DISTRIBUTION AND DISPENSING OF CONTROLLED
SUBSTANCES

70.     Paragraphs 1 through 69 of the Indictment are incorporated by reference as though fully set forth herein.

71.     On or about the dates set forth below, in the Southern District of Ohio, and elsewhere, the defendant TROY BALGO knowingly, intentionally, and unlawfully dispensed and distributed, and caused to be dispensed and distributed, outside the usual course of professional practice and not for a legitimate medical purpose, the controlled substances listed below, each of which constitutes a separate count of this Indictment:

| Ct. | Patient | Date of Written Prescription | Controlled Substance(s), Prescriptions |
|-----|---------|------------------------------|----------------------------------------|
| 3 | C.P. | 9/25/2018 | Fentanyl; Oxycodone |
| 4 | H.P. | 9/25/2018 | Fentanyl; Oxycodone |
| 5 | R.B. | 9/27/2018 | Oxycodone; Hydromorphone; Alprazolam |
| 6 | B.D. | 9/27/2018 | Fentanyl |
| 7 | L.P. | 11/26/2018 | Oxycodone; Morphine |
| 8 | J.F. | 11/27/2018 | Oxycodone |

72.   Specifically, BALGO caused prescriptions for dangerous and highly addictive controlled substances to be submitted and allowed co-conspirators, known and unknown to the Grand Jury, to cause prescriptions for those substances to be distributed in his name outside of the usual course of medical practice and not for a legitimate medical purpose.

73.   As outlined above, on the dates of these prescriptions BALGO was not in the State of Ohio to perform any physical or diagnostic testing of these individuals, or to review the physical or diagnostic testing of any supporting nursing staff in support of the prescriptions distributed in his name.

**In violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2.**

### COUNT NINE

## CONSPIRACY TO COMMIT UNLAWFUL DISTRIBUTION
## AND DISPENSING OF CONTROLLED SUBSTANCES

74.     Paragraphs 1 through 73 of the Indictment are incorporated by reference as though fully set forth herein.

75.     On or about the dates set forth in Count 1 through 8, in the Southern District of Ohio, and elsewhere, the defendant TROY BALGO knowingly and intentionally combined, conspired, confederated, and agreed together with other persons known and unknown to the Grand Jury, to unlawfully distribute and dispense the controlled substances outlined above.

### Purpose of the Conspiracy

76.     The purpose of the conspiracy was to maximize profits and cause the illegal dispensing of dangerous and highly addictive Schedule II controlled substances, such as fentanyl, morphine, oxycodone, oxymorphone, and hydromorphone, as well as other controlled substances such as alprazolam, among others, by prescribing such medications outside of the usual course of accepted medical practice and without a legitimate medical purpose.

77.     It was the further purpose of the conspiracy that BALGO and co-conspirators diverted proceeds of the unlawful diversion for the personal use and benefit of the defendant in the form of compensation and other means of remuneration.

## Manners and Means of the Conspiracy

78.     Specifically, BALGO knowingly and intentionally combined, conspired, and agreed with other persons, known and unknown to the Grand Jury, to write or electronically submit prescriptions for dangerous and highly addictive controlled substances while BALGO was not present to appropriately treat, assess, or diagnose patients as required prior to the distribution of those substances.

**In violation of 21 U.S.C. §§ 846(a)(1), 841(b)(1)(C) and 18 U.S.C. § 2.**

## FORFEITURE ALLEGATIONS

79.     The allegations contained in paragraphs 1 through 78, and specifically Counts 1 through 9, of this Indictment are incorporated here for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853.

80.     Upon conviction of the offenses in violation of Title 18, United States Code, Section 1347 set forth in Count 1 of this Indictment, the defendant TROY BALGO shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

81.     Upon conviction of a violation of Title 21, United States Code, Sections 841, as alleged in Counts 2 through 9 of this Indictment, the defendant TROY BALGO shall forfeit to the United States of America any property constituting, or

20

derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

82. Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of a conspiracy to violate Title 18, United States Code, Section 1347 and/or Title 21, United States Code, Section 841, in violation of Title 18, United States Code, Section 371, such as those set forth in Counts 2 and 9 of this Indictment, the defendant TROY BALGO shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violation(s).

83. The property to be forfeited includes, but is not limited to, the following:

a. any property, real or personal, that constitutes or is derived, directly or indirectly, as the result of such violation;

b. any DEA license(s) for BALGO; and

c. any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

84. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

i. cannot be located upon the exercise of due diligence;

ii. has been transferred or sold to, or deposited with, a third party;

iii.  has been placed beyond the jurisdiction of the Court;

iv.  has been substantially diminished in value; or

v.  has been commingled with other property that cannot be subdivided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

**All pursuant to 18 U.S.C. §982(a)(7), 28 U.S.C. § 2461(c), and Title 21, United States Code, Section 853(a).**

A TRUE BILL:

 s/ Foreperson
FOREPERSON

BENJAMIN C. GLASSMAN
United States Attorney

ALLAN J. MEDINA
UNITED STATES DEPARTMENT OF JUSTICE
ACTING CHIEF, HEALTH CARE FRAUD UNIT
CRIMINAL DIVISION, FRAUD SECTION

CHRISTOPHER M. JASON
Trial Attorney
United States Department of Justice, Criminal Division

22